SAPC, INC., Plaintiff,

v.

LOTUS DEVELOPMENT CORPORA-
TION and Mitchell D. Kapor,
Defendants,

and

LOTUS DEVELOPMENT CORPORA-
TION and New Sai, Inc.,
Counterclaim-plaintiffs,

v.

SAPC, INC., Julian E. Lange, Richard
A. Lange and Tracy R. Licklider,
Counterclaim–Defendants.

Civ. A. No. 87–0858–K.

United States District Court,
D. Massachusetts.

Nov. 3, 1988.

As Modified Dec. 7, 1988.

**1010**

Mark A. Michelson, Choate, Hall & Stewart, Boston, Mass., for plaintiff.

Testa, Hurwitz & Thibeault, Bernard J. Bonn, III, Boston, Mass., for Mitchell D. Kapor.

Henry B. Gutman, Esq., Kerry Conrad, O'Sullivan Graw & Karabell, New York City, for Lotus Development Corp.

Skadden, Arps, Slate, Meagher & Flom, Thomas J. Dongherty, Lori Weiner Lander, Boston, Mass., for Lotus Development Corp. and New SAI, Inc., counterclaim plaintiffs.

## OPINION

KEETON, District Judge.

### I.

The complaint in this case alleges a claim for copyright infringement. Defendants assert, among other defenses, that any cause of action that may have existed was assigned to defendant Lotus Development Corporation in an Asset Purchase Agreement of June 7, 1985 between plaintiff, as seller, and Lotus as buyer. Jurisdiction in this court depends upon whether plaintiff has asserted a claim arising under the Copyright Act.

Case law holds that federal jurisdiction should be declined by the court where a claim purportedly arising under the Copyright Act is essentially for a declaration of ownership or contractual rights. *See Topolos v. Caldewey*, 698 F.2d 991 (9th Cir. 1983); *Stepdesign, Inc. v. Research Media, Inc.*, 442 F.Supp. 32 (S.D.N.Y.1977). It is nevertheless permissible in appropriate circumstances for a federal court to exercise pendent jurisdiction over state law claims where the complaint states a valid federal law claim. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ In this case, the court, with the consent of the parties, bifurcated the trial. The first phase concerns whether the Asset Purchase Agreement transferred to buyer any claim for copyright infringement that seller had against buyer, and thus either extinguished the claim by merging the opposing interests into single ownership or at the least precluded any later assertion of the claim by seller. If the court concludes that the Asset Purchase Agreement does not, by such a transfer, have the legal effect of extinguishing SAPC's rights in any claim for copyright infringement, the second phase will plainly involve questions arising under the Copyright Act—questions that would require the court to examine the computer programs involved, the extent of the alleged copying by defendant, and an application of the Copyright Act to the facts of the case. *E.g., Topolos v. Caldewey*, 698 F.2d at 994.

The argument for jurisdiction in this court is reinforced by the fact that the outcome of Phase One (determining whether an assignment or transfer of a "copyright" includes a cause of action for prior copyright infringement) could, under a conceivable resolution of other issues in Phase One, involve an interpretation of one or more provisions of the Copyright Act. Moreover, even if this suggestion is rejected and the Phase One issue is determined to be purely one of contract interpretation, this court is permitted, under *Gibbs* and its progeny, in the interests of fairness to the parties and efficient use of judicial resources, to exercise pendent jurisdiction over the state law contract issues. That is so even if, when determined, the outcome of Phase One moots the question of copyright infringement. *Cf. Kennedy v.*

*Wright,* 851 F.2d 963 (7th Cir.1988) (holding that where the district court bifurcated a patent suit into ownership and validity components, and where judgment on the ownership question mooted the question of the validity of the patent, the Court of Appeals for the Federal Circuit still had exclusive jurisdiction over the appeal under 28 U.S.C. § 1295(a)(1)). I conclude that this court may and should exercise pendent jurisdiction over all Phase–One issues, even if none of them is considered to be an issue arising under The Copyright Act.

## II.

Under an order for phased trial pursuant to Fed.R.Civ.P. 42(b), Phase One of this case was tried before the court, without a jury. This phase of trial concerned the interpretation of the June 7, 1985 Asset Purchase Agreement between Plaintiff Software Arts Production Corporation ("SAPC") and Defendants Lotus Development Corporation and Mitchell D. Kapor ("Lotus"). The order regulating trial, entered with the consent of the parties, identified the ultimate issue for the first phase of trial in this way: "whether all pre-existing causes of action for copyright infringement were transferred in conjunction with the copyrights in question by means of the Asset Purchase Agreement" (Docket No. 66). I will first consider whether the contract is complete and unambiguous in relation to this issue; an affirmative answer to this question would obviate any need to address issues regarding admissibility of evidence outside the contract.

## III.

The "parol evidence rule", as commonly understood, forbids consideration of evidence introduced for the purpose of contradicting unambiguous terms of an integrated agreement. It does not, however, preclude consideration of evidence of background facts that explain the context in which the agreement was made. *See Louis Stoico, Inc. v. Colonial Development Corp.,* 369 Mass. 898, 902, 343 N.E.2d 872, 875 (1976) (citations omitted). The most significant background facts in this case are undisputed.

SAPC was the copyright owner and originator of "VisiCalc", the computer indus-

try's first interactive computerized spreadsheet. For a brief period in 1980, Defendant Kapor worked for Personal Software Inc., which was the exclusive marketing agent for VisiCalc.

In 1982, Kapor formed Defendant Lotus Development Corporation, and developed "Lotus 1–2–3". Plaintiff and Defendants agree that Lotus 1–2–3 had a severe, if not fatal impact on SAPC's sales of VisiCalc.

In late March and early April 1985, Lotus and SAPC began negotiations for the purchase and sale of VisiCalc and other SAPC assets. These negotiations were consummated on June 7, 1985, and the parties executed the "Asset Purchase Agreement" (Plaintiff's Exhibit 1).

Plaintiff alleges that in October 1982 it considered suing Lotus for copyright infringement and decided against suit based on the state of the law at the time and the low probability of success on the merits. It is stipulated by the parties, nevertheless, that no representative of SAPC, at any time during negotiations leading to the Asset Purchase Agreement, made any statement about any possible claim for copyright infringement. I conclude however, that this evidence extrinsic to the Asset Purchase Agreement should not be considered as bearing on the interpretation of the Asset Purchase Agreement unless that agreement is determined to be ambiguous in relation to a matter material to the issue to be decided in the first phase of trial.

## IV.

The parties in this case, although advancing different contentions about interpretation of the Asset Purchase Agreement, contend as their respective primary assertions that it is an unambiguous, integrated agreement. Also, the agreement contains an integration clause. According to Massachusetts law, that clause is presumptive evidence of the parties' manifested intent that the contract be the complete and final statement of the agreement. *See Charles A. Wright, Inc. v. F.D. Rich Co.,* 354 F.2d 710, 714 (1st Cir.), *cert. denied,* 384 U.S. 960, 86 S.Ct. 1586, 16 L.Ed.2d 673 (1966). The presumption of finality created by the integration clause is reinforced in this instance by the completeness and specificity of the Asset Purchase Agreement as

a whole. I conclude that the contract was manifestly meant to be a complete and integrated document.

In these circumstances, if the language of the contract has an ascertainable meaning as to the issues in dispute, the court must not consider extrinsic evidence to vary or modify that meaning. *See Roberts–Neustadter Furs, Inc. v. Alyce B. Simon,* 17 Mass.App.Ct. 262, 269 n. 4, 457 N.E.2d 668, 673 (Mass App.Ct.1983). In deciding whether an ambiguity exists, the court looks first to the words of the contract.

The critical provision of the Asset Purchase Agreement is section 2.1 "Acquired Assets".

> Buyer agrees to acquire, purchase and accept from seller, all of seller's right, title and interest in and to the following assets of seller, ... whether tangible or intangible or mixed:
>
> (a) all trademarks, patents, servicemarks (together with the goodwill of the business in connection with which such trademarks, servicemarks and patents are used), copyrights (and applications for any of the foregoing) ...
>
> (b) all computer programs (in whatever form embodied or in whatever stage of completion) ... and all trade secrets and intellectual property embodied in, related to, or underlying such computer programs....

SAPC argues that section 2.1 of the Asset Purchase Agreement, specifically the transfer of "copyrights", does not, without express reference to an accrued cause of action, transfer such a cause of action to Lotus. SAPC further argues that this provision, when read together with the document as a whole, establishes clearly that only "certain assets" specifically enumerated in the agreement were sold to Lotus. SAPC argues that the court's decision, although one resolving a question of traditional contract interpretation, must be informed by the substantive law of copyright, which holds that when a party transfers or assigns a copyright to another, that transfer does not include prior causes of action for copyright infringement. *See*

*Eden Toys, Inc. v. Florelee Undergarment Co.,* 526 F.Supp. 1187 (S.D.N.Y.1981), *rev'd on other grounds,* 697 F.2d 27 (2d Cir. 1982); *see generally* 3M. Nimmer, *Nimmer on Copyright,* § 12.02 at 12–26–28.

The case law, however, carves out one minor and infrequently used exception to this general rule. This exception applies when all assets of a business are sold in addition to and in connection with the sale of the copyright. *See National Council of Young Israel, Inc. v. Feit Co., Inc.,* 347 F.Supp. 1293 (S.D.N.Y.1972). SAPC argues that circumstances of the present case are not within this exception.

Defendants argue that this case falls within the exception for two reasons: (1) substantially all of SAPC's assets were purchased by Lotus in the agreement memorialized in the Asset Purchase Agreement and (2) the general rule that causes of action are reserved despite the transfer of a copyright should not apply to this case because the policy underlying that rule is designed to prevent double recovery (a policy not relevant to this case, in which the purchaser, Lotus, is the alleged infringer).

I conclude that I need not determine the scope of the rule governing the transfer of copyrights, or the scope of any exception to that rule, because the Asset Purchase Agreement unambiguously assigns not only the VisiCalc copyrights but also any then existing claims for infringement. Thus, in relation to this dispute, the manifested meaning of the Asset Purchase Agreement is clear.

In relation to disputed claims regarding transfer of renewal rights—an area of copyright law one might regard as similar to that involved in the present dispute—courts "have been hesitant to conclude that a transfer of copyright (even if it includes a grant of 'all right title and interest') is intended to include a transfer with respect to the renewal expectancy". 2M. Nimmer, *Nimmer on Copyright,* § 9.06 at 9–68–69 (citations omitted). However, both the Second and Ninth Circuits have held that despite the general reluctance of courts to hold that a sale of a "copyright" includes a transfer of renewal rights, it is appropriate

for a court to so conclude when the intention of the parties is clearly manifested by a written agreement or other admissible evidence. *See Venus Music Corp. v. Mills Music, Inc.,* 261 F.2d 577 (2d Cir.1958); *Rohauer v. Friedman,* 306 F.2d 933 (9th Cir.1962).

In *Rohauer v. Friedman,* 306 F.2d at 936, the court found that despite the absence of an express contractual provision transferring renewal rights and the traditional rule against transfers of renewal rights absent such an express provision, the language of the agreement in general, together with the circumstances of its execution, evidenced an intent of the parties to transfer the renewal rights. Plaintiffs argue that *Rohauer* is inapposite because renewal rights are *future* rights whereas the accrued cause of action in this case was a right existing at the time the document was drafted. A choice as to the way in which renewal rights are characterized, however—whether as existing at the time of registration, or coming into existence at the time for renewal or upon transfer—is not of moment. Rather, the *Rohauer* court based its decision on the language of the agreement, to wit: "METRO has sold, assigned and set over unto LOEW's . . . all right, title and interest of METRO in and to any and all motion pictures . . . and all copyright thereof" *Id.,* at 934. The same analysis applies in this case. Regardless of whether the background rule is one in which the cause of action is not automatically transferred with the copyright, this court can in this instance readily ascertain the objectively manifested intent of the parties from the agreement itself.

Section 2.1 transfers without reservation all copyrights, trademarks, servicemarks, computer programs, good will and intellectual property to Lotus. Section 2.1(b) includes the phrase "and all . . . *intellectual property* in, *related to,* and underlying such computer programs" (emphasis added). If the word "intellectual" had been omitted, "property" certainly would have conveyed a meaning broad enough to include intangible property (such as claims and causes of action) "related to" intellectual property interests (such as copyrights)

and in particular any claims "related to" the computer programs that were a central focus of the Asset Purchase Agreement. Thus, in its effect the plaintiff's contention would cause the introduction of the word "intellectual" before "property" to serve a limiting or narrowing function reducing the scope of the description of the assets purchased. In context, however, when read in a common sense way, the word "intellectual" serves the function of underscoring and emphasizing that all intellectual property rights in these computer programs, and rights related to those intellectual property rights, are being transferred.

Despite the broad granting language of section 2.1(b), plaintiff argues that the limiting language of section 2.1(e) means that only those assets specifically identified elsewhere are being transferred. Section 2.1(e) states that Lotus is not acquiring any other asset of SAPC "including, but not limited to" certain identified assets. These assets include such things as tax attributes, cash, and securities, and "accounts or notes receivable in dispute or in litigation, all of which items are specifically described in Exhibit 4.16", and finished goods inventory relating to Radio Shack versions of Seller's products, or stock of SAI. Exhibit 4.16 lists the "threatened litigation", none of which relates to a claim for copyright infringement. Although section 2.1(e) could if read alone be understood as suggesting that there may be other unlisted assets, like the cause of action in issue, not transferred by the sale to Lotus, that is not a reasonable interpretation of this language in the context of the entire Asset Purchase Agreement. A compelling interpretation is that in the context of their Asset Purchase Agreement the parties meant "including but not limited to" to refer to assets of the same general nature as the specific items identified. *Cf. Noyes Supervision, Inc. v. Canadian Indem. Co.,* 487 F.Supp. 433, 437 (D.Colo.1980) (holding that where general words follow a list of specific persons or things, the general words will be interpreted as applicable only to persons or things of the same general nature as the specific items). For ex-

ample, if an "account[ ] ... receivable [of SAPC] in dispute or in litigation", previously unidentified in the contract, were collected by Lotus after the purchase and sale of SAPC assets by Lotus, it would be reasonable to construe the language of section 2.1(e) as requiring Lotus to transfer the collection on that account to SAPC.

The balance of the agreement, whether read together with or apart from section 2.1(e), conveys the meaning that Lotus acquired, without limitation, the use of SAPC's copyrights and computer programs. There is no language in the contract that could reasonably be read as meaning that the interests related to the intellectual property, which were purchased by Lotus, were limited in any way other than that those interests that had been transformed into "accounts or notes receivable in dispute or in litigation" were not transferred.

Section 4.10 represents that neither SAPC nor its stockholders know of any grounds for the assertion of a claim for infringement *against it.* Although this provision does not explicitly state that the seller knows of no grounds on which a claim can be made against *buyer*, it serves the function of assuring the buyer, Lotus, that it will not be subjected to "assertion of a claim" against it in connection with assets purchased. Section 4.16 represents that no action, suit, proceeding, claim or investigation is threatened or instituted against seller, or involving any of seller's properties or assets. Again, this provision, though not explicitly excluding actions by seller against buyer, serves the function of assuring buyer that it is not acquiring assets against which an action is pending or threatened in law or in equity.

The absence of language explicitly stating that *seller* would not make a claim against *buyer*, rather than suggesting an inference that such claims were being reserved by seller, more cogently supports the inference that the possibility of such claims would have been all but unthinkable to parties to an agreement such as the Asset Purchase Agreement. Indeed, it is a reasonable inference that the thought, if generated in the sprightly imagination of any negotiator, would have been suppressed without being voiced because of its patent inconsistency with the agreement and the likelihood that its expression, if taken seriously, would have destroyed any prospect of agreement. Silence in these circumstances has no tendency to support a reasoned inference of a manifestation of agreement for reserving potential claims of the *seller* against the *buyer* of the assets purchased.

These conclusions are reinforced by the rule that, in determining the manifested intent of the parties, a court should construe the language of their agreement against the background of an assumption, absent evidence to the contrary, that the bargaining process was meant to and did result in a fair bargain, made in good faith. *See Frigaliment Importing Co. v. B.N.S. International Sales Corp.,* 190 F.Supp. 116, 120 (S.D.N.Y.1960) (holding that the reference to "chicken" in the contract did not mean "broilers" since buyer "must have expected [seller] to make some profit —certainly it could not have been expected deliberately to incur a loss").

Throughout the document are references to possible claims, causes of action, and threatened liability. Inclusion of these sections in the contract plainly served to satisfy Lotus that it was not acquiring a lawsuit in addition to the copyrights and other intellectual property transferred. The representation that there were no outstanding claims threatened or pending against SAPC (and thus against Lotus after the purchase and sale) was especially significant since the business purchased was of a kind expected to be valuable precisely because of its unique potential for the future. As Judge Friendly reasoned in *Frigaliment Importing Co. v. B.N.S. International Sales Corp.,* 190 F.Supp. at 120, it would be unreasonable to read the contract as one in which one party would be expected to suffer a loss in the future. The reservation of claims of the *seller* against the *buyer* would be even more inconsistent with the manifested expectations of the parties in this case than was the interpretation of the contract in *Frigaliment* that the

court there soundly rejected. Thus in this case, it would be unreasonable to find that Lotus acquired every other right associated with the computer programs for VisiCalc, including the copyrights and other intellectual property, but failed to acquire a possible claim that the seller (SAPC) had against the buyer in connection with the very same computer programs and copyrights. The language of the agreement as a whole makes clear that the parties fashioned a comprehensive transfer of SAPC's software business and software works, excluding some relatively minor assets unrelated to the potential for future profit from the intellectual property purchased by Lotus. To hold otherwise would defeat the benefit of the bargain fashioned by the parties and would contradict the general granting language of the Asset Purchase Agreement.

## V.

■ In reaching the foregoing conclusions I have not considered (apart from background evidence supporting the findings stated in Part III) the evidence offered by the parties extrinsic to the Asset Purchase Agreement. For this reason, I need not and do not address the objections to evidence and motions to strike on which ruling was reserved during trial.

■ I proceed to address, however, an issue that would arise should a higher court disapprove the foregoing ruling. I have examined the proffered evidence to ascertain whether as factfinder I would reach a different result were I to consider the proffered extrinsic evidence in determining the meaning of the Asset Purchase Agreement. That examination of the extrinsic evidence reveals that in no instance has either party offered any evidence that any manifestation, express or implied, was made by any person on one side to any person on the other side of the negotiations as to whether a claim for copyright infringement by *seller* against *buyer* was or was not to be reserved. The deposition testimony and documentary evidence extrinsic to the Asset Purchase Agreement contain no communication between the parties relating in any way to such a claim as

is asserted here. The inferences that the plaintiff argues a factfinder should draw from the extrinsic evidence are attenuated in the extreme. Even if as factfinder I should treat them as plausible, they are heavily outweighed by the more cogent implications of the words of the Asset Purchase Agreement. In short, the extrinsic evidence relied upon by the plaintiff provides no illumination about the issue under consideration, and no creditable support for the plaintiff's contention. Thus, even if considering as admissible the challenged extrinsic evidence relied upon by the plaintiff, and considering none of the challenged evidence relied upon by defendant, as factfinder I would nevertheless find (just as I have determined from the words of the Asset Purchase Agreement itself) that the parties did not reserve to the *seller* any claim against the *buyer* for copyright infringement.

## VI.

For the foregoing reasons, I conclude that the Asset Purchase Agreement transferred, along with the copyrights in question, all pre-existing causes of action for copyright infringement. Judgment will be entered for defendants upon plaintiff's claims for copyright infringement allegedly arising before the date of the Asset Purchase Agreement.

By separate order a conference will be scheduled to consider the form of judgment and what, if any, proceedings may be required for disposition of any claims not resolved in this Opinion.