SAPC, INC., Plaintiff, Appellant,

v.

**LOTUS DEVELOPMENT CORPORATION et al.,** Defendants, Appellees.

No. 89–1509.

United States Court of Appeals, First Circuit.

Heard Oct. 5, 1990.

Decided Dec. 18, 1990.

Rehearing and Rehearing En Banc Denied Feb. 15, 1991.

Mark A. Michelson with whom Brian A. Davis, Kenneth W. Gurge, and Choate, Hall & Stewart, Boston, Mass., were on brief, for plaintiff, appellant.

Henry C. Dinger with whom Stephen D. Poss and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendant, appellee Mitchell D. Kapor.

Henry B. Gutman with whom Kerry L. Konrad, Karen F. Conway, O'Sullivan Graev & Karabell, New York City, Thomas F. Dougherty, and Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., were on brief for defendant, appellee Lotus Development Corp.

Before BOWNES and TORRUELLA, Circuit Judges, and BROWN,* Senior Circuit Judge.

JOHN R. BROWN, Circuit Judge.

In 1985, Lotus Development Corp. (Lotus) purchased the entire software business of Software Arts (SAPC).[1] Less than two years later, SAPC filed suit alleging that Lotus, and its founder Kapor, had violated SAPC's copyright and misappropriated trade secrets in SAPC's program "Visicalc" prior to the sale of that copyright to Lotus. We affirm the trial court's holding that the Asset Purchase Agreement unambiguously transferred or extinguished all of SAPC's rights as part of the transaction pursuant to which Lotus acquired all rights related to the Visicalc program. 699 F.Supp. 1009.

## A Tangled Web

■ The trial judge found the most significant background facts undisputed.[2] We adopt these factfindings, which are not clearly erroneous. F.R.Civ.P. 52(a).

SAPC originated and held the copyright on a computer software program called "Visicalc," the first interactive computerized spreadsheet. In 1980, Kapor worked for Personal Software, Inc., the exclusive marketing agent for Visicalc.

In 1982, Kapor formed Lotus and developed "Lotus 1-2-3" ("1-2-3"). All parties agree that "1-2-3" had a severe if not fatal impact on Visicalc sales.

In March and April, 1985, SAPC and Lotus began negotiations for the purchase and sale of Visicalc and other SAPC assets. The Asset Purchase Agreement was executed on June 7, 1985 to consummate the deal.

Less than two years later, in April 1987, SAPC filed suit against Lotus and Kapor, alleging (i) copyright infringement, (ii) breach of contract, (iii) unjust enrichment, (iv) misappropriation, and (v) violation of Mass.Gen.Laws ch. 93A §§ 2 and 11.[3]

The trial judge bifurcated the trial. Phase I was to determine whether the Agreement had the effect of terminating SAPC's claims for copyright infringement, and the related claims, against Lotus and Kapor. Because the trial court determined that it did, Phase II, which would have involved application of the Copyright Laws to determine infringement was never tried.

## The Art of the Deal

■ Both parties assert that the Asset Purchase Agreement (the Agreement) is an

---

* Of the Fifth Circuit, sitting by designation.

1. Lotus also purchased the Software Arts name. As part of the transaction, Software Arts changed its name to SAPC.

2. The parol evidence rule does not preclude consideration of background facts that explain the context in which the agreement was made.

See *Louis Stoico, Inc. v. Colonial Development Corp.,* 369 Mass. 898, 902, 343 N.E.2d 872, 875 (1976).

3. All of these claims were asserted against both Lotus and Kapor except the unjust enrichment claim which was only asserted against Lotus.

unambiguous, integrated agreement.[4] This creates the presumption that the parties intended the contract to be the complete and final statement of their agreement. *See Charles A. Wright, Inc. v. F.D. Rich Co.*, 354 F.2d 710, 714 (1st Cir.), *cert. denied*, 384 U.S. 960, 86 S.Ct. 1586, 16 L.Ed.2d 673 (1966). The trial judge concluded that the Agreement was "manifestly meant to be a complete and integrated document." He determined as well that the contract was not ambiguous and therefore, no extrinsic evidence could be considered to vary or modify its meaning.[5] We agree. *See RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987) (whether writing is ambiguous is a question of law for the court and is subject to plenary review).

The critical provision of the contract is Section 2.1, *Acquired Assets.* In this section, Lotus agreed to:

acquire, purchase and accept from [SAPC], *all of [SAPC's] right, title and interest* in and to the following assets of [SAPC], wherever located, as the same shall exist at the Closing Date, including, *whether tangible or intangible or mixed:*

(a) *all trademarks, patents, servicemarks* (together with the goodwill of the business in connection with which such trademarks, servicemarks and patents are used), *copyrights* (and applications for any of the foregoing), logos, tradenames and all other names or slogans used by [SAPC] in connection with its business and goodwill ...;

(b) *all computer programs* (in whatever form embodied or in whatever stage of completion) ... and *all trade secrets and intellectual property embodied in, related to or underlying such computer programs*, all recorded know-how or know-how within [SAPC's] control, trade secrets, test data, processes, formulae,

inventions, designs, prototypes, drawings, manufacturing data, test and quality control data, and technical reports pertaining to such computer programs, and the exclusive right and license to manufacture any and all products manufactured by [SAPC]....

....

(e) any prepaid item related to any of the above assets; *provided, however,* that

(1) [Lotus] is not acquiring any other asset of [SAPC], including, but not limited to:

(i) assets which are Tax Attributes ...;

(ii) cash, cash equivalents and securities;

(iii) accounts or notes receivable in dispute or in litigation ...;

(iv) finished goods inventory relating to Radio Shack (Tandy) versions of [SAPC's] products; or

(v) stock of SAI.

(Emphasis added in introduction and subparagraphs (a) and (b)).

SAPC's argument boils down to the proposition that the broad and general granting provisions of Section 2.1(a) and (b), by which Lotus acquired all of SAPC's tangible and intangible rights and interest relating to its copyrights and computer programs, did not convey causes of action for prior infringement of the copyrights it was selling. On the contrary, SAPC asserts that the specific references of the proviso in Section 2.1(e), because the proviso was "including, but not limited to" those specific references, evidence the parties' intent to reserve as well to SAPC a pre-existing infringement claim against Lotus.

We recognize that none of these provisions explicitly deals with the claim at issue here. However, we determine that SAPC's interpretation of the contract is strained

---

4. The Agreement also contains an integration clause.

> 10.7 *Prior Understandings.* This Agreement represents the complete agreement of the parties with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings.

5. In a later part of his opinion, the trial judge made an alternative ruling that even considering the extrinsic evidence, all of which he had heard, his result would not change. Because we agree that the Agreement is unambiguous, we need not reach this alternative ruling.

and contrary to the clear intent of the parties that Lotus was to acquire "everything the seller has"[6] in relation to Visicalc.

By Section 2.1(a) and (b), Lotus acquired all SAPC's intangible property relating to any of its copyrights and computer programs, including all rights relating to trade secrets or other intellectual property. By transferring all rights and interests related to all of SAPC's intellectual property, this language unambiguously assigns not only the Visicalc copyrights, but any then existing claims for infringement. *See Rohauer v. Friedman*, 306 F.2d 933, 936 (9th Cir. 1962) (assignment of "all right title and interest" transferred both the copyright and the right to renew by its "all inclusive" language); *Bartsch v. Metro–Goldwyn– Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir.), *cert. denied*, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968) (broad conveyance of motion picture rights encompassed all uses that might reasonably fall within the medium described by the license).

■ The party seeking to deviate from the terms of a broad and general conveyance, such as that in Section 2.1(a) and (b) has the burden of proving the asserted specific exception. *See Rohauer*, 306 F.2d at 936 (given all-inclusive language of assignment, no evidence in record supports conclusion that seller intended to retain rights in copyright); *cf. Bartsch*, 391 F.2d at 155 (given words broad enough to cover new use, it is grantor's burden to negotiate exception). SAPC failed to do so. All the proviso accomplished was to reserve to SAPC those assets not transferred in the prior paragraphs. Since Section 2.1(a) and (b) transferred to Lotus all rights related to Visicalc, Section 2.1(e) is irrelevant here.

SAPC's copyright standing cases, which it presses for the proposition that the transfer of a copyright does not convey claims for infringement that accrued prior to the transfer unless such claims are explicitly referenced in the agreement, avail them not.[7] Because the agreement unambiguously transferred accrued claims for infringement as well as SAPC's copyrights, this general rule of Copyright law need not be reached.[8]

The rule in the First Circuit is that in construing a written agreement, courts must consider every phrase and clause in light of all the others in the instrument, "which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties." *Boston Edison Co. v. FERC*, 856 F.2d 361, 365 (1st Cir.1988) (quoting *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 795, 494 N.E.2d 374, 378 (1986)). In applying this standard, we find several other clauses of the Agreement and ancillary documents which harmonize with our interpretation.

First, the Assignment of Copyrights executed by SAPC supports the view that the parties intended a transfer of rights broader than just the copyrights alone. The Assignment states that SAPC is "the holder of copyrights and owner of all rights in the works set forth." It further states that Lotus "desires to acquire the *entire interest of [SAPC]* in the Works." Finally, in the language of assignment, SAPC assigns to Lotus *"all its interest* in the Works, including the copyrights thereon...." R. 972.

Second, a reservation by SAPC of a claim against Lotus would be inconsistent with the meaning and intent of the representa-

---

6. SAPC's counsel testified at deposition that by specifying all "rights, title, and interest," SAPC was conveying everything it had with respect to the listed assets. R. 501.

7. SAPC cites the following: *Skor–Mor Products, Inc. v. Sears, Roebuck & Co.*, 1982 Copyright L. Dec. ¶ 25,397 (S.D.N.Y.1982); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 526 F.Supp. 1187, 1193 (S.D.N.Y.1981), *rev'd on other grounds*, 697 F.2d 27 (2d Cir.1982); *Co–Opportunities, Inc. v. National Broadcasting Co.*, 510 F.Supp. 43, 46

(N.D.Cal.1981); *Ed Brawley, Inc. v. Gaffney*, 399 F.Supp. 115, 116 (N.D.Cal.1975); *DeSilva Construction Corp. v. Herrald*, 213 F.Supp. 184, 192–93 (M.D.Fla.1962); *Manning v. Miller Music Corp.*, 174 F.Supp. 192, 194–95 (S.D.N.Y.1959); *Group Publishers, Inc. v. Winchell*, 86 F.Supp. 573, 576 (S.D.N.Y.1949).

8. In addition, the formal Assignment of Copyrights does transfer *all* of SAPC's interest, including the copyright, in Visicalc. R. 972.

**364**

tions and warranties made by SAPC in the Agreement. For example, in Section 4.16, SAPC warranted:

> Except as otherwise set forth on *Exhibit 4.16* hereto, there are no actions, suits, proceedings, claims or investigations formally instituted and pending, or threatened against [SAPC] or involving any of its properties or assets, at law, or in equity or admiralty ... and neither [SAPC] nor any of its assets or properties ... is subject to any order, writ, injunction, decree or judgment. ...

This language is a representation by SAPC that there were no undisclosed claims involving any of its properties or assets at the time of Closing. The fact that SAPC did not here reserve its claim against Lotus implies that the parties did not intend such a claim to survive execution of the Agreement.

Third, in the Agreement, SAPC became subject to a Covenant of Further Assurance, in Section 3.4, by which it promised to:

> execute and deliver such further instruments of conveyance and transfer and take such other action as Lotus ... may reasonably request to convey and transfer more effectively to [Lotus] rights and title to any of the [assets acquired]. ...

Thus, SAPC was obligated to cure any deficiencies in the transfer of rights or title such as the alleged omission to transfer SAPC's claim against Lotus.

Finally, the Agreement reflects the expectation that SAPC would soon cease to exist. For example, SAPC sold its goodwill to Lotus in Section 2.1. Section 2.2(c) reflects that part of the purchase price was for SAPC's "going concern value." SAPC agreed to terminate its contracts as promptly as possible and to allow certain contracts that couldn't be terminated to expire in accordance with their terms (i.e.

to prevent automatic renewals).[9] In addition, SAPC gave Lotus written shareholder approval of SAPC's plans for dissolution and intent to liquidate within a year.

None of SAPC's arguments belie the meaning of these clauses of the Agreement or associated documentation. For example, SAPC argues that its representations and warranties relate only to third party claims. The disjunctive language of the provision and the Covenant of Further Assurance show that SAPC warranted that there were *no* claims against any of the property being sold and that it would transfer any rights necessary to defend against any claims that did arise. SAPC also argues that Section 2.1(e) and other provisions reflect the parties' intent that SAPC would continue as a corporate entity. We agree that SAPC was to continue long enough to conclude certain business obligations, but find the intent was that SAPC would have no additional functions and would liquidate as soon as those obligations were met.

Thus there can be no doubt that the Asset Purchase Agreement, along with the associated documentation, conveyed to Lotus *all* of SAPC's rights and interest in the Visicalc copyright and all related rights. This included SAPC's claim against Lotus for prior infringement. Likewise, SAPC could not have reserved any claims for unjust enrichment, breach of contract, misappropriation of trade secrets, or violation of Mass.Gen.Laws. ch. 93A by reason of the foregoing.

■ These state law claims all arose out of Kapor's alleged breach of a nondisclosure agreement regarding Visicalc. We hold that any right to enforcement of that contract, or claim for misappropriation of the trade secrets it protected, was likewise extinguished by the Agreement. SAPC sold all its rights and interest in its trade

---

**9.** Section 6.5(b):

[SAPC] shall after the Closing Date terminate all contracts of [SAPC] relating to the Purchased Assets or Inventory or the business conducted by [SAPC] prior to the Closing Date (except for the contracts listed on *Exhibit 6.5*) as promptly as possible provided that it can do so without breaching such contracts.

[SAPC] shall provide ... Lotus with evidence of each such termination. The contracts set forth on *Exhibit 6.5* shall be allowed by [SAPC] to expire in accordance with their terms, or terminated at [SAPC's] option, and [SAPC] shall take all actions within its control to ensure that such contracts are not automatically renewed.

secrets and intellectual property in Section 2.1. If that weren't enough, SAPC also warranted, in Section 4.14, that there were no undisclosed contracts which "could have a material effect" on the assets sold. SAPC's failure to include the nondisclosure agreement with Kapor shows that neither party intended that any claim arising out of that contract would survive the sale.

AFFIRMED.