PARFUMS GIVENCHY, INC., Plaintiff,

v.

C & C BEAUTY SALES, INC., Defendant.

No. CV 92–7455 MRP.

United States District Court, C.D. California.

Sept. 1, 1993.

Ronald L. Olson, Lawrence C. Barth, Munger, Tolles & Olson, Los Angeles, CA, Peter J. Nickles, Curtis A. Bradley, Caroline M. Brown, Covington & Burling, Washington, DC, for plaintiff.

Greer, Homer & Bonner, P.A., R. Lawrence Bonner, Blaxberg, Grayson & Singer, Moises T. Grayson, Miami, FL, McMurry, Russ, August, Kabat & de Recat, Susan L. Harrison, Prescilla Dugard, Los Angeles, CA, for defendant.

## OPINION

PFAELZER, District Judge.

Plaintiff Parfums Givenchy, Inc. ("Givenchy USA") brought this copyright infringement action against defendant C & C Beauty Sales, Inc. ("C & C Beauty") pursuant to Section 602(a) of the Copyright Act of 1976, which prohibits the "[i]mportation into the United States, without the authority of the owner of copyright . . . of copies or phonorecords of a work that have been acquired out-side the United States." 17 U.S.C. § 602(a). Givenchy USA filed a motion for summary judgment on March 3, 1993. The Court took the motion under submission on April 5, 1993, pursuant to the stipulation of counsel. On June 22, 1993, Givenchy USA filed a motion for statutory damages; the Court took that motion under submission on August 25, 1993.

The Court now grants Givenchy USA's motion for summary judgment except insofar as it seeks reimbursement of attorney's fees. The court denies Givenchy USA's motion for statutory damages.

## FACTS

Givenchy USA, a New York corporation, is the exclusive authorized distributor of Givenchy perfume products in the United States. The products are manufactured in France by Givenchy USA's parent company, Parfums Givenchy, S.A. ("Givenchy France"). Givenchy USA is the only party authorized to import these products into the United States for consumption in this country. One of the products manufactured by Givenchy France and distributed in the United States by Givenchy USA is a perfume marketed under the name "Amarige." Each bottle of Amarige perfume is packaged in a box, the outside of which displays a two-dimensional artistic design (the "Amarige Box Design"). Employees of Givenchy France created this design in 1991.

On February 27, 1992, Givenchy France sold the United States rights to the copyright in the Amarige Box Design to Givenchy USA. Givenchy USA recorded the copyright in the design with the United States Copyright Office, which issued a registration certificate to Givenchy USA effective March 24, 1992.

During 1992, Givenchy spent over five million dollars advertising Amarige perfume throughout the United States and promoting its image as a high-quality, high-prestige luxury item. The Amarige Box Design is prominently featured in the advertising and is an important part of the overall Amarige perfume product.

Defendant C & C Beauty is a Florida corporation with its principal place of business in Miami, Florida. It is a self-described importer of "gray market" perfume products.[1] Without Givenchy USA's authorization, C & C Beauty has been importing into this country and purchasing from third-party, gray-market importers substantial quantities of Amarige perfume products (including the Amarige Box Design), and then distributing them to retail stores. According to Givenchy USA, C & C Beauty's unauthorized importation and distribution of Amarige perfume in the United States threatens to erode Givenchy USA's exclusive market and undermine the image of the Amarige perfume product as a high-quality, high-prestige luxury item.

## PROCEDURAL HISTORY

Givenchy USA's present suit against C & C Beauty is closely connected with an earlier suit brought by Givenchy USA in this Court against Drug Emporium, Inc., one of C & C Beauty's largest customers. In that case, Givenchy USA claimed that Drug Emporium had infringed Givenchy USA's exclusive right to distribute the copyrighted design that appears on the packaging of Amarige perfume, in violation of Section 602(a) of the Copyright Act.

On September 17, 1992, this Court preliminarily enjoined Drug Emporium from continued distribution of the Amarige Box Design. On November 23, 1992, on Givenchy USA's motion for summary judgment, this Court entered a permanent injunction against Drug Emporium and awarded Givenchy USA its reasonable attorney's fees[2] and costs. *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, No. CV 92–4206 MRP, 1992 WL 532166 (C.D.Cal. Nov. 23, 1992). The Court held, *inter alia*, that the "first sale" doctrine did not shield Drug Emporium from liability under Section 602(a) of the Copyright Act.

The same day that this Court entered a preliminary injunction against Drug Emporium, C & C Beauty filed suit against Givenchy USA in the United States District Court for the Southern District of Florida. C & C Beauty sought a declaratory judgment that its importation and distribution of the Amarige Box Design did not violate Section 602(a) of the Copyright Act, by virtue of the "first sale" doctrine. Givenchy USA then moved to transfer that action to this Court.

On December 18, 1992, Givenchy USA filed the present action. On January 20, 1993, C & C Beauty moved to dismiss this action, or, in the alternative, to transfer it to the United States District Court for the Southern District of Florida. C & C Beauty based its motion on the pendency of the declaratory judgment action it had filed in Florida.

On January 28, 1993, the Florida court issued an order transferring C & C Beauty's declaratory judgment action to this District. *See C & C Beauty Sales, Inc. v. Parfums Givenchy, Inc.*, No. 92–2157 CIV–MARCUS (S.D.Fla. Jan. 27, 1993). C & C Beauty subsequently withdrew its motion to dismiss or transfer, and has filed an answer to Givenchy USA's complaint. Givenchy USA now moves for summary judgment.

## DISCUSSION

■ Summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a

---

1. "Gray market" goods are goods that are intended to be sold outside the United States but which are imported into this country without the consent of the owner of the United States trademark or copyright associated with the good.

2. It is unclear from the record in the earlier lawsuit whether Drug Emporium's infringing activity "commenced" before the effective date of registration of the Amarige Box Design, in which case it could have been argued that Givenchy USA would not have been entitled to an award of attorney's fees. *See* 17 U.S.C. § 412(2) and discussion *infra* of statutory damages and attorney's

fees, at Section IV.B of this opinion. However, Drug Emporium never contended that its infringing activity commenced before the effective date of the registration of the Amarige Box Design, nor did it object to the award of attorney's fees.

In the present case, C & C Beauty did not even challenge Givenchy USA's entitlement to attorney's fees until it filed a "Supplemental Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment" on August 9, 1993, over four months after Givenchy USA had filed its reply in support of its motion for summary judgment.

judgment as a matter of law." Fed.R.Civ.P. 56(c). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e). In determining whether a triable issue exists, the court "'must view the evidence and inferences therefrom in the light most favorable to the party opposing the motion.'" *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir.1989) (quoting *Jewel Cos. v. Pay Less Drug Stores Northwest*, 741 F.2d 1555, 1559 (9th Cir.1984)).

Givenchy USA's claim arises under Section 602(a) of the Copyright Act of 1976, which provides:

> Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.

17 U.S.C. § 602(a).

■ The legislative history of this section makes clear that, in enacting it, Congress intended to protect copyright owners against the unauthorized importation of copies acquired outside the United States even when such copies are lawfully made:

> Section 602 ... deals with two separate situations: importation of "piratical" articles (that is, copies or phonorecords made without any authorization of the copyright owner), *and unauthorized importation of copies or phonorecords that were lawfully made.*

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 169 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5785 (emphasis added).

The history further states that "the mere act of importation ... constitute[s] an act of infringement." *Id.* at 170. This is confirmed by Section 501(a) of the Act, which states that "[a]nyone ... who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright...." 17 U.S.C. § 501(a).

■ By its terms, Section 602(a) sets forth three requirements for a copyright claim: (1) plaintiff must be the "owner of copyright" in the work in question; (2) copies of the work must have been imported into the United States "without the authority of the owner of copyright"; and (3) the imported copies must have been "acquired outside the United States." Each of these requirements is met here. The certificate of copyright registration in the Amarige Box Design is *prima facie* evidence of the validity of the copyright and of Givenchy USA's ownership thereof. *See* 17 U.S.C. § 410(c); *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir.1984). Givenchy USA's evidence, as well as C & C Beauty's pleadings and affidavits, establish that C & C Beauty has been importing and distributing Amarige perfume, including the Box Design, without Givenchy USA's consent, and that the perfume was originally acquired abroad. Thus, Givenchy USA's claim appears to fall squarely within the protection of Section 602(a).

C & C Beauty makes three arguments in its attempt to defeat summary judgment. First, it argues that Givenchy USA has failed to establish that it has standing to bring a claim under Section 602(a). Second, C & C Beauty argues that the "first sale" doctrine, codified in Section 109(a) of the Copyright Act, exempts it from liability under Section 602(a). Finally, it argues that the Amarige Box Design is not entitled to copyright protection because it is inseparable from the utilitarian article to which it is attached. Each of these arguments lacks merit, and Givenchy USA is entitled to summary judgment.

## I. *Standing*

■ At the outset, C & C Beauty attacks Givenchy USA's standing to bring its claim under Section 602(a). C & C Beauty points out that Givenchy USA's evidence concerning the date of the alleged infringement consists solely of an affidavit executed by Rene A. Garcia, vice president of C & C Beauty, stating that C & C Beauty purchased Amarige perfume on February 4 and 9, 1992.

Givenchy USA did not acquire the copyright in the Amarige Box Design until February 27, 1992. Since a copyright owner is entitled to sue only for infringement which occurs during the period of ownership, *see* 17 U.S.C. § 501(b), C & C Beauty contends, Givenchy USA has failed to establish its standing to sue for the infringement at issue in this case. This contention lacks merit.

**A. Liability for Distribution of an Infringing Work**

■ It is well settled that the *distribution* of an infringing work subjects the distributor to liability. *See, e.g., Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir.1985); *Ford Motor Co. v. B & H Supply, Inc.*, 646 F.Supp. 975, 989 (D.Minn.1986); *Columbia Broadcasting Sys., Inc. v. Scorpio Music Distributors, Inc.*, 569 F.Supp. 47, 48–49 (E.D.Pa.1983), *aff'd without op.*, 738 F.2d 424 (3d Cir.1984). Furthermore, a copyright owner may sue "any member of the distribution chain." *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 207 (D.C.Cir.1981).

As discussed elsewhere in this opinion, C & C Beauty's unauthorized importation of Amarige perfume products, including copies of the Amarige Box Design, constitutes copyright infringement under Section 602(a). There is no dispute that C & C Beauty distributed Amarige perfume products after February 27, 1992, the date when Givenchy USA acquired the copyright in the Amarige Box Design. In so doing, C & C Beauty infringed Givenchy USA's "exclusive right to distribute copies or phonorecords of works manufactured abroad." *BMG Music v. Perez*, 952 F.2d 318, 319 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2997, 120 L.Ed.2d 873 (1992). Givenchy USA has standing to sue for this infringement.

**B. Scope of the Assignment**

■ In addition, Givenchy USA has standing to bring this action—for both the initial importation and the subsequent distribution of Amarige perfume—because it received, by assignment from its parent company, not only the Amarige Box Design copyright but also the right to sue for previously accrued infringement claims.

■ Although an assignment of a copyright ordinarily is presumed not to convey the right to sue for prior causes of action, this presumption is not conclusive, but instead depends on the particular circumstances of the assignment. *See SAPC, Inc. v. Lotus Development Corp.*, 921 F.2d 360, 363 (1st Cir.1990); *Custom Decor, Inc. v. Nautical Crafts, Inc.*, 502 F.Supp. 154, 157 (E.D.Pa.1980). Here, the assignment from Givenchy France to Givenchy USA purports to transfer "all right, title, and interest" in the United States copyright for the Amarige Box Design. The subject matter of the assignment was a new product that had been introduced into the United States market less than a month before the assignment. In addition, Givenchy USA is a subsidiary of Givenchy France and thus it must be assumed that Givenchy USA would not bring a lawsuit without the authority of the parent company.

Given these circumstances, it would be unreasonable to conclude that Givenchy France had reserved to itself causes of action accruing during the short time period between the product's introduction into the United States and the date of the assignment. *See SAPC, Inc.*, 921 F.2d at 362–63; *cf. Rohauer v. Friedman*, 306 F.2d 933, 936 (9th Cir.1962) (finding that assignment of all "right, title and interest" included assignment of right to renew copyright, in light of "circumstances surrounding its execution"). If there were any doubt about this point, it would be dispelled by a declaration submitted by Givenchy USA in support of its motion. In that declaration, Jean Courtiere, the person who executed the assignment, states that Givenchy France intended to and did transfer to Givenchy USA the right to pursue claims for infringement of the United States copyright in the Amarige Box Design accruing before the time of the assignment. Thus, the Court is satisfied that Givenchy USA is the assignee of not only the Box Design copyright but also the right to sue on claims previously accrued by the assignor.

## II. *The "First Sale" Doctrine*

C & C Beauty's principal defense in this case is the "first sale" doctrine, which is codified at Section 109(a) of the Copyright Act. Section 109(a) states:

Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109(a). This section provides, in essence, that once the copyright owner has transferred ownership of a particular copy of the work, the person to whom the copy has been transferred is entitled to dispose of it by sale, rental, or any other means. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 79 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693. C & C Beauty contends that, because the Amarige perfume products at issue in this case were the subject of a valid first sale in France, C & C Beauty's importation and distribution of the products did not infringe any of Givenchy USA's rights. C & C Beauty's contention lacks merit.

### A. *The Ninth Circuit's Opinion in* BMG Music v. Perez

The Ninth Circuit addressed precisely this issue in *BMG Music v. Perez*, 952 F.2d 318 (9th Cir.1991), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 2997, 120 L.Ed.2d 873 (1992). The plaintiffs in that case owned the United States copyright in various sound recordings; the defendant purchased phonorecords of these sound recordings that had been manufactured abroad, and, without the plaintiffs' consent, imported them into the United States and sold them. The plaintiffs sued, claiming that the defendant had infringed their copyrights under Section 602(a). The defendant argued that the first sale doctrine shielded him from liability.

The court disagreed, and held that the first sale doctrine does not provide a defense to an infringement action under Section 602(a) when the copies in question have been manufactured outside the United States. *Id.* at 319. The court based this conclusion on two grounds, which it adopted from *Columbia Broadcasting System, Inc. v. Scorpio Music Distributors*, 569 F.Supp. 47 (E.D.Pa.1983), *aff'd without op.*, 738 F.2d 424 (3d Cir.1984). First, the court looked to the language of the first sale doctrine as set forth in Section 109(a), and interpreted the phrase "lawfully made under this title" to mean "legally manufactured and sold within the United States." *BMG Music*, 952 F.2d at 319 (citing *Scorpio*, 569 F.Supp. at 49). Thus, the court reasoned that "[t]he words 'lawfully made under this title' in § 109(a) grant first sale protection only to copies legally made and sold in the United States." *Id.* (citing *Scorpio*, 569 F.Supp. at 49). The *Scorpio* court's analysis, on which the Ninth Circuit relied, is set forth as follows:

Defendant's contentions would be more persuasive were it not for the phrase— lawfully made under this title—in § 109(a). I conclude that the section grants first sale protection to the third party buyer of copies which have been legally manufactured and sold within the United States and not to purchasers of imports such as are involved here. The protection afforded by the United States Code does not extend beyond the borders of this country unless the Code expressly states. Absent a clearly expressed legislative intent to the contrary, statutory language must be recognized as conclusive.

*Scorpio*, 569 F.Supp. at 49 (citation omitted).

Second, the court in *BMG Music* reasoned that " '[c]onstruing § 109(a) as superseding the prohibition on importation set forth in ... § 602 would render § 602 virtually meaningless.' " *BMG Music*, 952 F.2d at 319 (quoting *Scorpio*, 569 F.Supp. at 49). The court adopted this rationale, as it did the first, from *Scorpio*, in which the district court for the Eastern District of Pennsylvania explained:

Construing § 109(a) as superseding the prohibition on importation set forth in the more recently enacted § 602 would render § 602 virtually meaningless. Third party purchasers who import phonorecords could thereby circumvent the statute, in every instance, by simply buying the recordings indirectly. Moreover, declaring legal the

act of purchasing from a United States importer who does not deal directly with a foreign manufacturer, but who buys recordings which have been liquidated overseas, would undermine the purpose of the statute. The copyright owner would be unable to exercise control over copies of the work which entered the American market in competition with copies lawfully manufactured and distributed under this title. This court cannot construe the statute so as to alter the intent of Congress, which has set restrictions on the importation of phonorecords in order that rights of United States copyright owners can be preserved.

*Scorpio,* 569 F.Supp. at 49–50.

The facts in this case are virtually identical to those in *BMG Music,* and this Court is, of course, bound by the Ninth Circuit's interpretation of the Copyright Act in that case.[3] Moreover, for reasons that will be set forth below, this Court believes that the Ninth Circuit in *BMG Music* reached the proper result, and agrees with the courts' observation in that case and in *Scorpio* that construing Section 109(a) as superseding Section 602(a)'s prohibition on importation would render Section 602(a) virtually meaningless. *BMG Music,* 952 F.2d at 319; *Scorpio,* 569 F.Supp. at 49. The Court wishes to note, however, that the text and legislative history of the 1976 Copyright Act do not appear to support the *BMG Music* and *Scorpio* courts' theory that Congress intended the words "lawfully made under this title" in Section 109(a) to mean "legally manufactured and sold within the United States."

*"Lawfully Made Under This Title"*

The *Scorpio* court seems to have conflated two separate grounds for finding that Section 109(a) does not apply to copies manufactured abroad. It is unclear from the court's analysis whether the court meant to state that the United States Code as a whole—and there-fore the Copyright Act—does not apply extraterritorially, or that the words "lawfully made under this title" in Section 109(a) render that particular section inoperative outside the United States. *See Scorpio,* 569 F.Supp. at 49. Either way, however, the analysis appears to be flawed.

■ Absent a clearly expressed statutory intent to the contrary, courts should presume that the United States Code applies only to actions "occurring within, or having effects within," the United States. *Beechwood Music Corp. v. Vee Jay Records, Inc.,* 328 F.2d 728, 729 (2d Cir.1964). However, the unauthorized importation into and distribution within the United States of copyrighted goods clearly has an effect within the United States—it prevents the United States copyright owner from realizing the full value of each copy released into the United States market with his authorization. Thus, the judicial presumption against the application of United States statutory law does not apply in cases such as *BMG Music, Scorpio,* or the present case.

As for the second proposition, interpreting the words "lawfully made under this title" to mean "legally manufactured in the United States" would contravene Congressional intent. Such an approach "would withhold the first sale defense from any goods lawfully manufactured abroad even if they were imported with the authority of the United States copyright owner—a result that contradicts the policy behind section 109(a) and the terms of section 602(a)." 1 Paul Goldstein, Copyright § 5.6.1, at 604 (1989).

Furthermore, nothing in the legislative history supports this interpretation of Section 109(a). *See generally* Stephen W. Feingold, *Parallel Importing Under the Copyright Act of 1976,* 17 N.Y.U.J. Int'l L. & Pol. 113, 130–33 (1984) (discussing legislative history of first sale doctrine as codified in 1909 and 1976 Copyright Acts). Section 109(a) re-

---

**3.** A number of other district courts have also refused to apply the first sale doctrine to actions under Section 602(a) for unauthorized importation of copies or phonorecords manufactured abroad. *See Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.,* 658 F.Supp. 458, 463 (E.D.Pa.1987); *T.B. Harms Co. v. Jem Records,* *Inc.,* 655 F.Supp. 1575, 1583 (D.N.J.1987); *Hearst Corp. v. Stark,* 639 F.Supp. 970, 974–77 (N.D.Cal.1986); *Selchow & Righter Co. v. Goldex Corp.,* 612 F.Supp. 19, 25 (S.D.Fla.1985); *Nintendo of America, Inc. v. Elcon Indus., Inc.,* 564 F.Supp. 937, 943–44 (E.D.Mich.1982).

places the earlier codification of the first sale doctrine in Section 27 of the 1909 Act,[4] which stated: "[N]othing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained." Act of Mar. 4, 1909, ch. 320, § 27, 35 Stat. 1075, 1084 (1909) (amended 1976). The words "lawfully made" in Section 109(a) are similar to the words "lawfully obtained" in the former Section 27, which in turn signified that only valid forms of vending[5] could constitute a "first sale" so as to trigger the first sale doctrine. *See Platt & Munk Co. v. Republic Graphics*, 315 F.2d 847, 852 (2d Cir.1963) (the phrase "lawfully obtained" signifies "that there is no intention to enlarge in any way the construction to be given the word 'vend' in the first section ...").[6] The doctrine was re-drafted in Section 109(a) so as to remove any ambiguity as to what constitutes a valid form of vending. *See* Staff of House Comm. on the Judiciary, 89th Cong., 1st Sess., Copyright Law Revision Part 5: 1964 Revision Bill with Discussion & Comments 66 (Comm.Print 1965) (Barbara Ringer, member of the Copyright Office's General Revision Steering Committee, stating: "The basic purpose of [Section 109(a)] is to make clear that full ownership of a lawfully-made copy authorizes its owner to dispose of it freely, and that this privilege does not extend to copies obtained otherwise than by sale or other lawful disposition. In other words, if you obtain a copy by loan or by rental, you are not free to dispose of it freely or to use it in any way you see fit."). The words "under this title" were added to ensure that the Copyright Act itself would be the guide for determining the validity of a sale. *See* H.R.Rep. No. 1476, at 79, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693 ("To come within the scope of section 109(a), a copy or phonorecord must have been 'lawfully made under this title,' though not necessarily with the copyright owner's authorization. For exam-

ple, any resale of an illegally 'pirated' phonorecord would be an infringement, but the disposition of a phonorecord made under the compulsory licensing provisions of section 115 would not."); S.Rep. No. 473, 94th Cong., 1st Sess. 72 (1975) (containing essentially the same language); H.R.Rep. No. 83, 90th Cong., 1st Sess. 38 (1967) (same); S.Rep. No. 982, 93d Cong., 2d Sess. 123 (1974) (same).

▮ In sum, the legislative history of Section 109(a) reveals that the phrase "lawfully made under this title" clarifies what constitutes a "first sale" for purposes of the first sale doctrine; it makes no reference to the location of the manufacture or sale of the goods. Thus, the courts in *BMG Music* and *Scorpio* do not appear to have had a sound basis for interpreting that phrase to mean "lawfully manufactured and sold within the United States."

## B. *Reconciling the Importation Right and the First Sale Doctrine*

As discussed above, this Court is bound by the Ninth Circuit's holding in *BMG Music* and believes that the result in that case was correct. As stated, this Court agrees with the Court of Appeals' statement that to construe Section 109(a) as superseding the prohibition on importation set forth in Section 602(a) would render that section virtually meaningless. This Court believes, however, that another important rationale exists for holding that the first sale doctrine does not preclude liability for unauthorized importation under Section 602(a)—one that rests firmly on the text and policies underlying the distribution right, the importation right, and the first sale doctrine.

### 1. *Statutory Language*

At the outset, the Court notes that the language of several provisions of the Act suggests that Section 602(a)'s importation

---

**4.** Section 109(a) restates, but does not expand, the first sale doctrine as established by Section 27 of the 1909 Act and court decisions thereunder. *See* H.R.Rep. No. 1476, at 79, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693.

**5.** Section 1(a) of the 1909 Act provided that a copyright owner had the exclusive right "[t]o print, reprint, publish, copy, and vend the copy-

righted work." Act of Mar. 4, 1909, ch. 320, § 1(a), 35 Stat. 1075, 1075 (1909) (amended 1976).

**6.** The words "lawfully obtained" in Section 27 of the 1909 Copyright Act did not refer to the locality of the first sale.

right is not limited by the first sale doctrine. First, while the text of Section 106(3) expressly provides that the distribution right is limited by Section 109(a), the text of Section 602(a) provides for no such limitation. *See* 17 U.S.C. §§ 106(3), 602(a).

Second, Section 602(a) states that unauthorized importation is actionable under Section 501, which provides the remedies for infringement. Section 501, in turn, creates a cause of action for infringement under Section 602 that is distinct from the cause of action for infringement under Section 106(3). Section 501 states: "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

Third, Section 602(a) lists exemptions for the importation of limited numbers of copies acquired for personal, scholarly, religious, or governmental purposes. 17 U.S.C. § 602(a). Since such copies will usually be lawfully made gray market goods purchased abroad through normal market channels, applying the first sale doctrine to Section 602(a) would violate the fundamental rule that a statute should be construed so as to avoid making any part of it superfluous. *Estate of Reynolds v. Martin*, 985 F.2d 470, 474 (9th Cir. 1993); *Kungys v. United States*, 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988); *see also* 1 Goldstein, *supra*, § 5.6.1.2, at 603–04.

2. *Legislative History and Policy Underlying Sections 106(3), 109(a), and 602(a)*

The legislative history and policy underlying Sections 106(3), 109(a), and 602(a) of the Copyright Act make clear that the first sale doctrine does not provide a defense to actions based on unauthorized importation under Section 602(a).

(a) *The Distribution Right and the First Sale Doctrine*

Section 106(3) establishes the distribution right as one of the exclusive rights constituting copyright ownership. It provides:

Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

. . . . .

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending....

17 U.S.C. § 106. By including all forms of transfer, not just sale, and prohibiting only transfers "to the public," Section 106(3) effectively embodies the right of first publication. 1 Goldstein, *supra*, § 5.5. It entitles the copyright owner to decide when, under what circumstances, and for what price he will release copies of his work to the public.[7]

■ The distribution right is not absolute. Once the copyright owner has voluntarily released his work to the public, the distribution right is no longer needed to protect the underlying copyright; at that point, the policy favoring a copyright monopoly for authors gives way to policies disfavoring restraints of trade and limitations on the alienation of personal property, and the first sale doctrine takes effect. 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.12[A] (1993).

■ The first sale doctrine is codified at Section 109(a), which provides that, "[n]otwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord ... is entitled, without the authority of the copyright owner, to sell or. otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a). The precise overlap between Section 106(3) and Sec-

---

7. In addition, the distribution right supplements the reproduction right, 17 U.S.C. § 106(1), by ensuring that the copyright owner can prohibit public distribution of her work, not only if it occurs through unauthorized reproduction, but also if the owner's own copies are stolen or otherwise wrongfully obtained and then publicly distributed. 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.12[A] (1993).

tion 109(a) is important in defining the scope of Section 602(a)'s importation right. The distribution right under Section 106(3) includes the right to control not only the "sale or other transfer of ownership" of copies or phonorecords, but also their disposition "by rental, lease, or lending." The first sale doctrine under Section 109(a), however, is concerned only with those forms of disposition which involve *sale or other transfer of ownership*. *See* 17 U.S.C. § 109(c)[8]; 2 Nimmer & Nimmer, *supra*, § 8.12[B], at 8–131. This is because, taken together, the distribution right and the first sale doctrine rest on the principle that the copyright owner is entitled to realize no more and no less than the full value of each copy or phonorecord upon its disposition. 1 Goldstein, *supra*, § 5.5, at 588–89, § 5.6.1, at 598; *see Platt & Munk*, 315 F.2d at 854. In fact, in determining what constitutes a "first sale" so as to trigger exemption from the distribution right, courts have applied a functional measure based on this principle and held that a first sale of copies or phonorecords has occurred if the disposition in question has enabled the copyright owner to realize their value. 1 Goldstein, *supra*, § 5.6.1, at 598 & n. 14; *see Platt & Munk*, 315 F.2d at 851 (" '[T]he author is just as much injured by being deprived of the price of a genuine copy as by having a piratical copy substituted for it.' ") (quoting *Henry Bill Publishing Co. v. Smythe*, 27 F. 914, 922 (C.C.S.D.Ohio 1886)); *Bobbs–Merrill Co. v. Straus*, 210 U.S. 339, 343, 351, 28 S.Ct. 722, 723, 726, 52 L.Ed. 1086 (1908) ("The facts disclose a sale of a book at wholesale by the owners of the copyright, at a satisfactory price....").[9]

### (b) Section 602(a)'s Importation Right

Prior to enactment of the Copyright Act of 1976, copyright owners could not prevent the unauthorized importation of their work into the United States. *See* Staff of House Comm. on the Judiciary, 87th Cong., 1st Sess., Copyright Law Revision: Report of the Register of Copyright on the General Revision of the U.S. Copyright Law 125–26 (Comm.Print 1961). The 1909 Act prohibited only the importation of piratical copies of copyrighted works; it did not restrict the importation of articles that were initially sold or manufactured under the authority of the copyright owner. *See id.;* Act of Mar. 4, 1909, ch. 320, § 30, 35 Stat. 1075, 1082 (1909) (amended 1976) ("[T]he importation into the United States of any article bearing a false notice of copyright when there is no existing copyright thereon in the United States, or of any piratical copies of any work copyrighted in the United States, is prohibited."). Copyright owners relied on contract law, unfair competition law, or trademark law to discourage unauthorized importation of their work. Feingold, *supra*, at 134–35.

Section 602(a) was enacted in response to concerns expressed by representatives of the printing and recording industries that contractual and other remedies were ineffectual,[10] and that unauthorized importation in-

---

**8.** Section 109(c) provides:

The privileges prescribed by subsections (a) and (b) do not, unless authorized by the copyright owner, extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it.

**9.** In *Platt & Munk*, for example, the court considered, under the 1909 Act, "whether an unpaid manufacturer of copyrighted goods, which are alleged to be defective by the copyright proprietor who has ordered them, may sell them in satisfaction of his claim for the contract price without infringing the 'exclusive right' of the proprietor to 'publish ... and vend the copyrighted work.' " 315 F.2d at 849 (quoting Act of Mar. 4, 1909, ch. 320, § 1(a), 35 Stat. 1075, 1075 (1909) (amended 1976)). The court held that the "first sale" which terminates the exclusive right to vend patented or copyrighted objects need not be a truly voluntary one, but can consist of some reasonable and recognized form of compulsory transfer, such as a judicial sale or court-compelled assignment. In such cases the ultimate question embodied in the "first sale" doctrine— whether or not there has been such a disposition of the article that it may fairly be said that the patentee [or copyright proprietor] has received his reward for the use of the article—is answered in the affirmative, since the proprietor or patentee has received from his creditor some value for which the copyrighted or patented article is now demanded unless the debt is paid.

*Id*. at 854 (citations and internal quotation marks omitted).

**10.** *See* Staff of House Comm. on the Judiciary, 88th Cong., 1st Sess., Copyright Law Revision Part 2: Discussion and Comments on Report of

fringed the rights of United States copyright owners. One representative, for example, testified:

> Very frequently you run into a situation where there is a copyright proprietor in the United States and copies of the same work—whether it's a book, or a piece of music, or something else—produced in a foreign country, may be shipped over here without violating any contract of the U.S. copyright proprietor. This is either because ... the [overseas] publisher sold it to an individual who in turn shipped it over here—that obviously doesn't violate the contract between the [overseas] and the American publisher ... but, as far as I am concerned, it is clearly infringement of the copyright of the U.S. proprietor.

Staff of House Comm. on the Judiciary, 88th Cong., 1st Sess., Copyright Law Revision Part 2: Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 213 (comment of Sidney A. Diamond).

Section 602(a) of the 1976 Act addresses these concerns by providing a swift and simple remedy for the unauthorized importation of copies or phonorecords into the United States. It makes the mere act of importation—regardless of sale—an infringement of Section 106(3)'s distribution right, and prohibits unauthorized importation, not only of pirated copies, but also of copies that were lawfully made. H.R.Rep. No. 1476, at 169–70, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5785.[11]

By providing that the unauthorized importation of copies or phonorecords infringes the distribution right, Section 602(a) effectively gives Section 106(3) an extraterritorial scope. *See* 1 Goldstein, *supra*, § 5.6.1.2, at 603, § 5.5, at 588–89. Under Section 106(3), the copyright owner has the right to decide under what conditions, including at what price, he will release copies of his work to the public. Where the owner elects to sell copies of his work, the first sale doctrine requires him to—and assumes that he will be able to—realize each copy's full value to him upon its initial sale. This "full value"—the price at which the copyright owner is willing to sell copies of his work—depends on market conditions and, in today's global economy, varies from country to country. For example, the owner of a copyright in a sound recording may demand $10 each to sell 1 million phonorecords of that sound recording in the United States, but may be willing to sell another 1 million phonorecords for $7 each in Australia in order to enter the market there or for some other legitimate business purpose. If the phonorecords originally sold for $7 in Australia are allowed to enter the United States, where they may then be sold again for, say, $8, the United States copyright owner is forced to compete with that price, and thus is prevented from receiving the $10 to which he is entitled for each of the phonorecords initially released into the United States

the Register of Copyrights on the General Revision of the U.S. Copyright Law 212 (Comm.Print 1963) (comment of Horace Manges: "When a U.S. book publisher enters into a contract with a British publisher to acquire exclusive U.S. rights for a particular book, he often finds that the English edition, for instance, of that particular book finds its way into this country. Now it's all right to say, 'Commence a lawsuit for breach of contract.' But this is expensive, burdensome, and, for the most part, ineffective."); *id.* at 213 (comment of Sidney A. Diamond), 232 (comment of American Book Publishers Council, Inc. and American Textbook Publishers Institute), 275 (comment of Walter J. Derenberg), 327 (comment of Horace Manges).

**11.** The House Report accompanying the 1976 Act states:

Section 602 deals ... with two separate situations: importation of "piratical" articles (that is, copies or phonorecords made without any authorization of the copyright owner), and unauthorized importation of copies or phonorecords that were lawfully made. The general approach of section 602 is to make unauthorized importation an act of infringement in both cases....

Section 602(a) first states the general rule that unauthorized importation is an infringement merely if the copies or phonorecords "have been acquired outside the United States"....

The second situation covered by section 602 is that where the copies or phonorecords were lawfully made but their distribution in the United States would infringe the U.S. copyright owner's exclusive rights.... [T]he mere act of importation in this situation would constitute an act of infringement and could be enjoined.

H.R.Rep. No. 1476, at 169–70, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5785–86.

market. Section 602(a) recognizes that such unauthorized importation effectively circumvents the distribution right.

It should be clear, then, that the first sale doctrine cannot apply to actions such as the present action for infringement under Section 602(a). Sections 106(3), 109(a), and 602(a) all rest on the principle that the copyright owner is entitled to realize the full value of each copy or phonorecord upon its disposition. Applying the first sale doctrine to actions for unauthorized importation of goods manufactured and first sold abroad would violate this principle and defeat Congress' intent, in enacting Section 602(a), to expand importation protection for copyright owners so as to avoid circumvention of the distribution right.[12]

Furthermore, it would be inconsistent with the text of the Copyright Act. As discussed earlier, the distribution right encompasses the right to control not only the "sale or other transfer of ownership" of copies or phonorecords, but also their disposition "by rental, lease, or lending." 17 U.S.C. § 106(3). The first sale doctrine, however, is concerned only with those forms of disposition that involve sale or other transfer of ownership. *See* 17 U.S.C. § 109(c); 2 Nimmer & Nimmer, *supra,* § 8.12[B], at 8–131. Section 602(a) prohibits the mere importation of copies or phonorecords regardless of whether they are actually sold. *See* H.R.Rep. No. 1476, at 170, 1976 U.S.C.C.A.N. 5786; *see also* Black's Law Dictionary 755 (6th ed. 1990) (defining "importation" as "[t]he act of bringing goods and merchandise into a country from a foreign country"); 1 Goldstein, *supra,* § 5.5.1, § 5.5.2.2, at 593 & n. 20. Thus, like the rights of rental, lease, and lending encompassed by the distribution right, the importation right is not affected by the first sale doctrine.

In the present case, the Amarige perfume products at issue were manufactured and first sold in France with the autho-rization of Givenchy USA's parent company, Givenchy France. Under Section 602(a), Givenchy USA had the right to prevent these products from entering the United States and competing with the identical products authorized to be distributed here. Because Givenchy USA is entitled to receive full compensation for each authorized copy of Amarige perfume, C & C Beauty cannot assert the first sale doctrine as a defense in this action and Givenchy USA is entitled to summary judgment.

### III. *Separability*

C & C Beauty's final argument is an attack on the copyrightability of the Amarige Box Design. C & C Beauty contends that the design is not entitled to copyright protection because it is inseparable from the useful article to which it is attached. *See Norris Indus., Inc. v. International Telephone & Telegraph Corp.,* 696 F.2d 918, 923 (11th Cir.1983), *cert. denied,* 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983). This contention also lacks merit.

The certificate of registration issued by the United States Copyright Office for the Amarige Box Design is *prima facie* evidence of the validity of the copyright. *See* 17 U.S.C. § 410(c); *Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 523 (9th Cir.1984). C & C Beauty has offered no evidence or legal authority that would rebut the presumption of validity.

It is well established that an artistic packaging design or label is entitled to copyright protection. *See Abli, Inc. v. Standard Brands Paint Co.,* 323 F.Supp. 1400, 1403 (C.D.Cal.1970); *Drop Dead Co. v. S.C. Johnson & Son, Inc.,* 326 F.2d 87, 93 (9th Cir. 1963), *cert. denied,* 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964); *Ford Motor Co. v. B & H Supply, Inc.,* 646 F.Supp. 975, 987–88 (D.Minn.1986). Indeed, the Copyright Office regulations make clear that a copyright may be issued for "a print or label that

---

**12.** This rationale does not apply where copies or phonorecords of a copyrighted work are manufactured and first sold in the United States, exported, and then brought back into the United States. *See Cosmair, Inc. v. Dynamite Enterpris-* es, Inc., 226 U.S.P.Q. (BNA) 344, 1985 WL 2209 (S.D.Fla.1985). In such a situation, the copyright owner has voluntarily released the copies into the United States market and has received the full value to which she is entitled for them. .

contains the requisite qualifications for copyright even though there is a trademark on it." 37 C.F.R. § 202.10(c) (1992).

■ Moreover, the Amarige Box Design is physically separable from the perfume with which it is associated and thus does not even raise an issue of "conceptual separability." Section 101 of the Copyright Act provides that "the design of a useful article" or a work of art that embellishes a useful article is copyrightable to the extent that it is capable of existing independently of the utilitarian aspects of the article. 17 U.S.C. § 101; *see Norris Indus.*, 696 F.2d at 923; *Kieselstein–Cord v. Accessories By Pearl, Inc.*, 632 F.2d 989, 992 (2d Cir.1980); *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985). The legislative history specifies that the design or embellishment may be separable from the useful article either physically or conceptually. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 55 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5668. The Amarige Box Design is a two-dimensional artistic design, which is physically separable from the utilitarian aspects of Amarige perfume. *See generally* 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.08[B][3] (1992). Thus, the issue of conceptual separability does not even arise. *Cf. Carol Barnhart,* 773 F.2d 411 (denying copyright to mannequin); *Esquire, Inc. v. Ringer,* 591 F.2d 796 (D.C.Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979) (denying copyright to lighting fixture); *Norris Indus.,* 696 F.2d 918 (11th Cir.1983) (denying copyright to wire-spoked wheel covers); *see also* H.R.Rep. No. 1476, at 55 ("A two-dimensional painting, drawing, or graphic work is still capable of being identified as such when it is printed on or applied to utilitarian articles such as textile fabrics, wallpaper, containers, and the like.").

### IV. *Relief*

### A. *Injunctive Relief*

As discussed previously, Givenchy USA has spent more than five million dollars advertising Amarige perfume nationwide and promoting its image as a high-quality, high-prestige luxury item. The Amarige Box Design is prominently featured in the advertising and is an important part of the overall Amarige perfume product. Moreover, Givenchy USA distributes Amarige perfume only to select, upscale retailers.

C & C Beauty's unauthorized importation of Amarige perfume, and its distribution of such perfume to unauthorized retailers such as Drug Emporium, threatens to cause Givenchy USA irreparable harm by eroding its exclusive market and undermining the image of the Amarige perfume product as a high-quality, high-prestige luxury item. *Cf. Judscott Handprints, Ltd. v. Washington Wall Paper Co.,* 377 F.Supp. 1372, 1380 (E.D.N.Y. 1974).

■ Given these circumstances, the Court finds it appropriate to issue a permanent injunction prohibiting C & C Beauty from infringing Givenchy USA's copyright in the Amarige Box Design and from publishing, selling, marketing, or otherwise disposing of any reproductions of the Amarige Box Design in the United States. *See* 17 U.S.C. § 502(a); *see also Universal City Studios, Inc. v. Sony Corp. of America,* 659 F.2d 963, 976 (9th Cir.1981), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06[B], at 14–94.4 (1993) ("Generally, it would appear to be an abuse of discretion to deny a permanent injunction where liability has been established and there is a threat of continuing infringement.").

### B. *Statutory Damages and Attorney's Fees*

■ Givenchy USA's motion for statutory damages requests an award of $100,000 pursuant to Section 504, which provides that "[e]xcept as otherwise provided by [the Copyright Act]," a copyright owner who prevails on an infringement claim may elect to receive statutory damages in lieu of actual damages and profits. 17 U.S.C. § 504. In its motion for summary judgment, Givenchy USA seeks reimbursement of costs and attorney's fees pursuant to Section 505, which states that in copyright actions the court may award costs to the prevailing party and, "[e]xcept as otherwise provided by [the Copyright Act], ... may also award a rea-

sonable attorney's fee ... as part of the costs." 17 U.S.C. § 505. Givenchy USA's motion for statutory damages must be denied, as must its request for attorney's fees.

 Section 412(2) provides that

[i]n any action under [the Copyright Act] ... no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for ... any infringement of copyright commenced after first publication of the work and before the effective date of its registration ... unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412. This section bars a copyright owner from recovering statutory damages or attorney's fees for copyright infringement if two conditions are met: (1) the copyright was registered more than three months after the work was first published, and (2) the infringing activity commenced after the date of first publication and before the effective date of registration of the work. *See, e.g., Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 403–04 (2d Cir.1989); *Robert R. Jones Associates, Inc. v. Nino Homes,* 858 F.2d 274, 281 (6th Cir. 1988).

In this case, the certificate of copyright registration issued to Givenchy USA for the Amarige Box Design states that the work was first published on September 2, 1991 in France,[13] and that registration became effective on March 24, 1992. Givenchy USA has alleged that C & C Beauty infringed its copyright by purchasing Amarige perfume products abroad, importing them into the United States, and reselling them without Givenchy USA's authorization. Givenchy USA has also presented evidence that the infringing purchases and sales began in February 1992 and continued without interruption through March 1993. Plaintiff's Motion for Statutory Damages, Declaration of Caroline M. Brown, ¶ 5. Thus, it is clear that the copyright in the Amarige Box Design was registered more than three months after first publication, and that the infringing importa-

tion first occurred after the date of first publication and before the effective date of registration.

Givenchy USA nevertheless contends that Section 412(2) does not preclude an award of statutory damages and attorney's fees in this case. Givenchy USA points to the language of Section 602(a), which provides that the unauthorized importation of copies or phonorecords is "an infringement," 17 U.S.C. § 602(a), and argues that because C & C Beauty engaged in numerous importations of Amarige products, it also "commenced" numerous "infringement[s]" within the meaning of Section 412(2). Therefore, Givenchy USA concludes, Givenchy USA is entitled to statutory damages and attorney's fees for importations that occurred after the registration of the Amarige Box Design.

Givenchy USA's argument is unpersuasive. Numerous courts have rejected it, and held that the first act of infringement in a series of ongoing separate infringements "commence[s]" one continuing "infringement" under Section 412(2). *See Mason v. Montgomery Data, Inc.,* 741 F.Supp. 1282, 1286 (S.D.Tex.1990), *rev'd on other grounds,* 967 F.2d 135 (5th Cir.Tex.1992); *id.* at 1285 ("A 'new' or 'separate' basis for the award of statutory damages is created ... only where there is a difference between pre- and post-registration infringing activities."); *Singh v. Famous Overseas, Inc.,* 680 F.Supp. 533, 535–36 (E.D.N.Y.1988); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 609 F.Supp. 1325, 1331 (E.D.Pa.), *aff'd on other grounds,* 797 F.2d 1222 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Johnson v. University of Virginia,* 606 F.Supp. 321, 324–25 (D.Va.1985). Givenchy USA attempts to distinguish these cases by pointing out that none of them involved infringement under Section 602(a). They involved, Givenchy USA argues, a single act of copying, or creation, followed by continued use or sale of the copies; thus, it was logical to hold that the infringement "commenced" with the initial act of copying. By contrast, C & C Beauty never copied the

---

**13.** Section 412 is "applicable to works of foreign and domestic origin alike." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 158 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5774. Thus, the fact that the Amarige Box Design was created and first published in France is irrelevant.

Amarige Box Design; rather, on a number of separate occasions, C & C Beauty commenced an infringement of Givenchy USA's copyright by importing a new batch of lawfully-made copies into the United States for distribution.

This Court finds such a distinction immaterial. The Copyright Act defines copying, or the creation of a derivative work, as an infringement separate from that of distribution, *see* 17 U.S.C. §§ 106, 501(a); following Givenchy USA's reasoning, the courts in *Mason, Singh, Whelan,* and *Johnson* could just as easily have held that a new infringement "commenced" under Section 412(2) each time the defendant infringed a separate provision of the Copyright Act.

Furthermore, the reasoning in these cases is consistent with the plain language and legislative history of Section 412(2) and thus applies equally to the present case. In *Singh,* for example, the court acknowledged that "[e]ach separate act of infringement is, of course, an 'infringement' within the meaning of the statute, and in a literal sense perhaps such an act might be said to have 'commenced' (and ended) on the day of its perpetration." 680 F.Supp. at 535. The court reasoned, however, that this would be an odd interpretation of the language of Section 412(2).

The word "infringement" can be used in two senses. As noted, it can mean both a single act of infringement, and it can also mean several or continuous or repeated acts of infringement. However, it would be peculiar if not inaccurate to use the word "commenced" to describe a single act. That verb generally presupposes as a subject some kind of activity that begins at one time and continues or reoccurs thereafter.

*Id.; see also Mason,* 741 F.Supp. at 1286 ("The plain language of the statute does not reveal that Congress intended to distinguish between pre- and post-registration infringements.").

The court in *Singh* further noted that the legislative history supports a construction based on the ordinary meaning of the text of Section 412(2). 680 F.Supp. at 535. The House Report accompanying the 1976 Copyright Act sets forth explicitly the purpose of that section:

Section 412. Registration as Prerequisite to Certain Remedies

The need for section 412 arises from two basic changes the bill will make in the present law.

(1) Copyright registration for published works, which is useful and important to users and the public at large, would no longer be compulsory, and should therefore be induced in some practical way.

. . . .

Under the general scheme of the bill, a copyright owner whose work has been infringed before registration would be entitled to the remedies ordinarily available in infringement cases: an injunction on terms the court considers fair, and his actual damages plus any applicable profits not used as a measure of damages. However, section 412 would deny any award of the special or "extraordinary" remedies of statutory damages or attorney's fees where . . . infringement commenced after publication and before registration (unless registration has been made within a grace period of three months after publication). These provisions would be applicable to works of foreign and domestic origin alike.

. . . . With respect to published works, clause (2) would generally deny an award of [statutory damages and attorney's fees] where infringement takes place before registration. As an exception, however, the clause provides a grace period of three months after publication during which registration can be made without loss of remedies; full remedies could be recovered for any infringement begun during the three months after publication if registration is made before that period has ended. This exception is needed to take care of newsworthy or suddenly popular works which may be infringed almost as soon as they are published, before the copyright owner has had a reasonable opportunity to register his claim.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 158 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5774.

This passage makes clear that because registration would no longer be compulsory under the 1976 Copyright Act, Congress sought to induce it by denying the "extraordinary" remedies of statutory damages and attorney's fees where copyright owners fail to register their work in a timely manner. Allowing such remedies where an infringing act occurs before registration and recurs after registration would defeat this purpose. *See Singh,* 680 F.Supp. at 536; *Mason,* 741 F.Supp. at 1286.

Here, Givenchy USA failed to register the copyright in the Amarige Box Design within the three-month grace period permitted under Section 412(2). C & C Beauty commenced its infringing importation before the effective date of registration; after that date, it repeated the same act each time, using the same copyrighted material. These acts constitute a series of ongoing infringements which commenced with the first act of importation in February 1992. *See Mason,* 741 F.Supp. at 1286. Givenchy USA is not entitled to an award of statutory damages[14] or an award of attorney's fees.

### CONCLUSION

Givenchy USA has established C & C Beauty's liability under 17 U.S.C. § 602(a) for unauthorized importation of copies of the Amarige Box Design and is entitled to a permanent injunction under 17 U.S.C. § 502(a). Givenchy USA's motion for summary judgment is hereby granted except insofar as it seeks reimbursement of attorney's fees.

Givenchy USA's motion for statutory damages is hereby denied.

---

14. Givenchy USA is, of course, entitled to seek actual damages and profits. 17 U.S.C. § 504(b).